SAYLOR et al. v. TAYLOR et al.

(Circuit Court of Appeals, Fourth Circuit. November 25, 1896.)

No. 196.

1. MARITIME LIENS—EMPLOYES ON STEAM DREDGE—ADMIRALTY JURISDICTION.

A steam dredge, without motive power, engaged in deepening navigable waters, and capable of being towed from place to place, is a "vessel," in the meaning of Rev. St. § 3, and is within the admiralty jurisdiction. Consequently, the persons employed on her and on her scows in such work are "seamen," in the meaning of Rev. St. § 4612, and entitled to a maritime lien for their services.

2. SAME—RANK OF SEAMEN'S LIEN FOR WAGES—PRIORITY.

Lien of the engineers and employés of the dredge, as seamen, outranks claims for towage and supplies furnished for the same voyage or undertaking.

3. SAME—LIENS FOR TOWAGE AND SUPPLIES—PRIORITIES—COURT RULES.

Liens for towage and supplies furnished near the same time, and for the same voyage or undertaking, are of equal rank, and must be discharged pro rata; and the power given the federal courts, by Rev. St. § 918, to prescribe rules, does not authorize a district court to prescribe that, among admiralty claims of equal dignity, the first libeling shall be paid first.

Appeal from the District Court of the United States for the Eastern District of Virginia.

This was an admiralty suit in rem, originating with the filing of a libel by A. J. Taylor & Bro., the owners of the tug D. M. Key, against the steam dredge Morgan and its accompanying scows. Intervening libels were filed shortly afterwards by S. S. Saylor and others for services rendered in various capacities on board the dredge and scows, and by Tubman and others for supplies. The district court decreed in favor of the original libelants, but held that the intervening libelants, claiming for services rendered, were not seamen, and consequently not entitled to a lien for their wages. From this decree these interveners have appealed.

A. W. Armstrong and James R. Caton, for appellants.

George A. Mushbach, for appellees.

Before GOFF and SIMONTON, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. In sustaining the libel, and decreeing priority of lien on the proceeds of the sale of the dredge and its accompanying scows in favor of the tug for towage, the court below has in effect decided that the dredge was a "vessel," and therefore subject to a maritime lien; otherwise, it would have had no jurisdiction. If it was a vessel, then the intervening libelants, the engineer and hands employed upon it in doing the work which it was engaged to do, must be considered as seamen, and entitled to priority of payment; for the ship has from the earliest times been recognized as the primary security for the seamen's wages, which take precedence over all other liens or claims upon the same corpus. The proper limits of the jurisdiction of the court of admiralty in cases of this nature are perplexed with refinements, but, whatever doubts may have existed as to such jurisdiction, they cannot be invoked in favor of the party who has sought it.

The libel is filed in behalf of the owners of the tug D. M. Key for services in towing the steam dredge Morgan and scows from Washington, D. C., to Acquia and Nomini creeks, in the state of Virginia. Intervening libels were filed by Saylor and others, engineer, deck hands, cook, and scowmen employed on the dredge and scows, and by Tubman and others for supplies. The dredge and scows have been sold, and the proceeds are in the registry of the court for the Eastern district of Virginia awaiting distribution. The learned judge of that district has decided that the dredge and scows are liable in admiralty for the services rendered, but that the laborers employed on the dredge are not entitled to a lien for wages as seamen, their work not being necessary to navigation. The record contains no precise description of the dredge; but, inasmuch as the testimony shows that she was engaged in cleaning out and deepening the channels in Acquia creek and Nomini creek, that she had no natural powers of propulsion by oars, sails, or steam, and was moved from Washington by water to the place where she was engaged, it may be assumed that such form and characteristics were given her as enabled her to navigate the water, and to transport from place to place the steam shovel placed upon her, and that her occupation was to transport from place to place such steam shovel and the engine and hands employed on her, and to maintain them afloat in her work of deepening channels in navigable waters,—an occupation incident to navigation. If so, then she falls within the definition of a "vessel," as given in section 3, c. 1, tit. 1, of the Revised Statutes of the United States, which is as follows:

"The word 'vessel' includes every description of water craft or other artificial contrivance used or capable of being used as a means of transportation on water."

A dredge of this description was held to be a vessel in The Alabama, 19 Fed. 544; Id., 22 Fed. 449; The Pioneer, 30 Fed. 206.

If this craft, this movable thing, capable of being transported on the water, and engaged in a work incidental to navigation, in shoveling mud and removing it by water, is a vessel, then she comes within the maritime jurisdiction, and the persons employed on her in that work are seamen, and the lien on the vessel for wages is correlative. Such persons fall within the definition of "seamen" in section 4612 of the Revised Statutes, which is as follows:

"In the construction of this title every person having the command of any vessel belonging to any citizen of the United States shall be deemed to be the 'master' thereof, and every person (apprentices excepted) who shall be employed or engaged to serve in any capacity on board the same shall be deemed and taken to be a 'seaman,' " etc.

The learned judge below, citing with approval The Atlantic, 53 Fed. 607, and holding that the men employed on a dredge are entitled to a lien, endeavors to draw a distinction between the persons so employed, and denies the lien to the intervening libelants here on the ground that their labor was not necessary to the navigation of the dredge, resting such decision upon The Minna, 11 Fed. 759, and The Ocean Spray, Fed. Cas. No. 10,412. In our opinion these cases do not support the conclusion, and it is impossible to reconcile the distinc-

tion with the rule established by a long line of decisions. In The Minna, the libelant was employed solely as a fisherman, taking no part in the navigation of the vessel, which went out every morning to the fishing grounds, returning at night, the libelant sleeping ashore; yet a decree was entered in his favor. The Ocean Spray was a schooner which sailed with master and crew from San Francisco for Bering Sea, with the intention of engaging in the seal fisheries. When 25 days out she took aboard some Indians, who were to be employed as sealers, to take and skin seals and preserve their skins; but the voyage was abandoned before any seals were taken. It was held that they were entitled to a lien upon the ship for wages as seamen.

It is difficult to fix with precision any line of delimitation between services essentially maritime and those claimed to be such because performed upon a vessel at sea, or within the ebb and flow of the tide; nor will it be profitable to follow the struggle for jurisdiction between the courts of common law and the court of admiralty. It is now well settled that all persons employed on a vessel to assist in the main purpose in which she is engaged are entitled to a lien for wages. So it has been held that clerks, carpenters, chambermaids, cooks, stewards,. and waiters are so entitled. Dest. Shipp. & Adm. § 173, and cases there cited. The statute above referred to, which declares that persons employed "in any capacity" upon vessels shall be deemed "seamen," seems conclusive upon this point. If it be considered necessary to give a reason for a rule supported by a great weight of authority, it would be found in this, that a vessel and her crew are considered a unit. Each person aboard of her contributes according to his capacity to the success of the enterprise in which she is engaged. If she comes within the maritime jurisdiction, the persons employed aboard of her come also, with all the rights and disabilities which flow therefrom. Among those rights, from the days of Oleron, are that the ship stands responsible for the wages of the seamen. It is this assurance that enables her to command those services that are essential to the prosecution of her enterprises. Seamen, as a rule, are of a class that would with difficulty find the owners of the ship, or persons responsible for their wages, and without such assurance that the law gives for the payment of their earnings their labor would not be obtainable, and maritime undertaking would languish. If the law undertook to weigh with nice discrimination the exact amount and character of service which each person employed aboard a vessel should render in order to entitle him to this lien, it would become a snare rather than a protection.

At first blush it would seem a stretch of the rule to hold a dredge and her accompanying scows to belong to the same class with ocean steamships. The idea of commerce does not come into the mind primarily in connection with such craft; but, when it is borne in mind that they are constructed to move upon the water, and nowhere else, and that, while thus moving upon the water, they are subject to all the rules that govern other water craft as to lights, collisions, etc., it will be seen that they have that mobility and capacity to navigate

which are recognized as the prime elements in determining the subjects of maritime liens. And so it seems a stretch of the imagination to class the deck hands of a mud dredge in the quiet waters of a Potomac creek with the bold and skillful mariners who breast the angry waves of the Atlantic; but such and so far-reaching are the principles which underlie the jurisdiction of the courts of admiralty that they adapt themselves to all the new kinds of property and new sets of operatives and new conditions which are brought into existence in the progress of the world. Hence it is that in all times and in all countries those who are employed upon a vessel in any capacity, however humble, and whose labor contributes in any degree, however slight to the accomplishment of the main object in which the vessel is engaged, are clothed by the law with the legal rights of mariners, "no matter what may be their sex, character, station, or profession." Ben. Adm. § 241.

The next question arises under the fifth assignment of error: "Because the court decreed that the libelants having filed the first libel were entitled to be paid in full, in preference to all other libelants asserting claims of equal dignity." The first libel was filed by Taylor & Bro., owners of the tug D. M. Key, on November 18, 1895. Other libels for supplies furnished to the dredge and crew and for other towage services were filed on November 25, 1895, and on December 5, 1895. Priority was allowed to the claim of Taylor by virtue of the fourth rule of the district court for the Eastern district of Virginia, promulgated December 19, 1893, the relevant portion of which is as follows:

"Among admiralty claims of otherwise equal dignity, the one first libeling shall be first paid, but petitioners shall be paid pro rata."

It was at one time contended, and the contention was supported by authority, that the rule of prior petens settled questions of priority among liens of the same grade, and priority was given according to the date of the process issued; but the great weight of authority supports the view that claims of the same rank and equal merit are entitled to share equally and pro rata in the proceeds of the sale of a vessel which are insufficient to pay all in full, and that seems to be in accordance with reason. Henry, Adm. Jur. & Proc. 201, states the rule as follows:

"Every maritime lien dates from its inception, and it is inconsistent with the nature of a maritime lien that it should depend upon the date at which its enforcement is sought."

And in 14 Am. & Eng. Enc. Law, p. 440, the rule is thus stated:

"If the liens are for money advanced, or for supplies, materials, or services in preparation for the same voyage, and are of the same rank, they are regarded as contemporaneous and concurrent with each other, and they will be discharged pro rata."

The following cases support the text: The J. W. Tucker, 20 Fed. 129; The Lady Boone, 21 Fed. 731; The Julia, 57 Fed. 234; The Fanny, 2 Low. 508, Fed. Cas. No. 4,638.

The reason is this: This kind of maritime lien does not, in any sense, owe its existence to the legal process by which it is enforced.

Beneficial liens arise out of the operation of the law which creates them and inhere in the property itself. They are a jus in re, enforceable in admiralty, but not having their origin in the court, or owing their meritorious character to its process.

In this case all the towage services and all the supplies furnished were for the same voyage or undertaking. All the liens owe their existence to the same principles of equity, and it would be unjust to subordinate those equities to a mere race of diligence. It is not a case where, through laches, new rights have been acquired or new credit given. All the supplies were furnished and all the services were rendered about the same time, and all the libels were filed within a few weeks of each other; Taylor being one week earlier than some of the others, because, it appears from the record, he was advised by the owner of the dredge to file his libel in order to secure his money. Upon reason, upon principle, and upon authority, all of the same class and of equal merit should share equally; and the only question remaining is whether these rights can be displaced by rule 4 of the district court, above cited. We are of the opinion that this rule cannot have that effect. The right to make rules is given in section 918 of the Revised Statutes in the words following:

"The several circuit and district courts may, from time to time, and in any manner not inconsistent with any law of the United States, or with any rule prescribed by the supreme court under the preceding section, make rules and orders directing the returning of writs and processes, the filing of pleadings, the taking of rules, the entering and making up of judgments by default, and other matters in vacation, and otherwise regulate their own practice as may be necessary or convenient for the advancement of justice and the prevention of delays in proceedings."

By virtue of this section the courts may make rules of practice, but they cannot create rules of law. They cannot divest or displace rights or liens which owe their existence, not to its process, but to the general maritime law. Rights acquired under the statutes of the United States, or under the general maritime law, which these courts are created to administer, are rules of property, and it is beyond the potency of judicial power to alter them, or take them away by rules of practice. In Ward v. Chamberlain, 2 Black, 437, Clifford, J., says:

"It cannot for a moment be admitted that any rule adopted by this court, merely as such, can enlarge, diminish, or vary the operation and effect of mesne or final process upon the property of the debtor in respect to the matter under consideration."

And on page 447:

"The lien of judgments is a rule of property, which is beyond the power of this court to establish."

The decree of the district court, in so far as it is in conflict with the opinions herein expressed, is reversed. In other respects it is affirmed.