## THE J. P. SCHUH.

(District Court, S. D. Alabama. January 30, 1915.)

### No. 1469.

1. MASTER AND SERVANT ⬤➾8—CONTRACTS OF HIRING—TERM OF EMPLOYMENT.
   A hiring at so much a day, unless there is a mutual understanding of the parties that the service is to extend for a certain fixed and definite time, is an indefinite hiring, determinable at the will of either party, and recovery may be had for the services actually rendered.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 8–10, 17; Dec. Dig. ⬤➾8.]

2. MASTER AND SERVANT ⬤➾73—SEAMEN ⬤➾2—CONTRACT OF HIRING OF DECK HANDS—LEAVING EMPLOYMENT—RIGHT TO WAGES—"SEAMAN."
   Libelants were hired orally as deck hands on a steamer employed as a towboat to take a number of barges up the river from Mobile, load them with cross-ties, and tow them down. No term of service or wages were mentioned, but the rate per day at which they were to be paid was understood. Libelants cleaned and loaded the barges. On the return trip three of the four barges stranded on a sand bar, and libelants worked unsuccessfully a part of the night to get them afloat. Next morning they were ordered to carry the ties from one of the barges onto the steamer, which they refused to do. They were then told, if they would not do the work, to get off the boat, and did so. Held, that they were not "seamen," within the contemplation of the statutes of the United States relating to seamen, and that in any event their leaving the vessel under the circumstances and in view of their contracts was not a desertion, which forfeited their right to the wages earned.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 90–102; Dec. Dig. ⬤➾73; Seamen, Cent. Dig. §§ 1–3; Dec. Dig. ⬤➾2.
   For other definitions, see Words and Phrases, First and Second Series, Seaman.]

In Admiralty. Suit by Anderson Jackson and others against the steamer J. P. Schuh. Decree for libelants.

H. T. Pegues, of Mobile, Ala., for libelants.
Hanaw & Pillans, of Mobile, Ala., for claimant.

TOULMIN, District Judge. The material facts in this case are few and simple, and without serious conflict. There is a conflict in the evidence as to some minor questions involved in the case.

The evidence on the part of the libelants was in substance that they

were hired by Mr. Spottswood to go up the river with the steamer J. P. Schuh, and barges in tow, four in number, to get cross-ties. They were to load the barges with cross-ties, and return with the steamer and the barges, loaded with the cross-ties, to Mobile; the barges thus loaded being in tow of the steamer. It did not appear from their evidence that at the time of the hiring Mr. Spottswood said anything to the libelants about the length of the trip, or the probable time it would consume, the specific work they were to do, or the wages to be paid them. It, however, appeared from the evidence that these men, or at least some of them, had made some prior trip or trips of like character under Mr. Spottswood's employment, and of the kind of work to be done, and the rate of wages he paid for it, which was stated to be $1.16⅔ a day; that if they were employed for as much as a month it was $35.00 a month, and if their employment was for any time less than a month it was at that rate—that is to say, $1.16⅔ a day. The libelants made the trip up the river, to Gullet's Bluff. One of the four barges had a derrick, called a "derrick barge," with which they loaded the ties onto the barges. On the way up the river the men cleaned the barges by taking out mud and water, etc., getting them ready to receive the cargo of cross-ties; and they also wooded the steamer. All the barges were loaded; the steamer and tow came on down the river, and when they reached a point, said to be about two days' run from Mobile, three of the barges got aground on a sand bar. This was on Saturday, and the evidence of the libelants was that they worked from that time trying to get the barges off until 1 or 2 o'clock Saturday night, using the lines in the work. Their evidence further was that about daylight next morning they were called out; that they went out and cut and carried wood to the engine room; that Mr. Spottswood then told them to go to taking the cross-ties from the barge which was lying alongside the steamer, both of which were afloat in the river and to put them on the steamer, to be carried down the river and put out on the bank, to be later reloaded on the barge there, that, the barge load being lightened, it might avoid getting aground. The libelants refused to comply with this direction or request of Mr. Spottswood, claiming they were too tired from the previous day's and night's work to "tote" the cross-ties from the barge onto the steamer. They testified that they so stated to Mr. Spottswood. It appears that this was about 9 o'clock a. m. Sunday. After some further talk on the subject, and the libelants insisting on their inability and refusal to "tote" the cross-ties as directed, Mr. Spottswood told them, "If you are not going to do the work, get off!" Some of the libelants stated that Mr. Spottswood said to them, "If you can't tote the cross-ties, get off and take to the woods!" One of the libelants testified that, in connection with Mr. Spottswood's order or declaration to get off and "take to the woods" he used some profane language toward them.

Spottswood in his evidence denied that he used any such language as is attributed to him, and stated that he used no profane language in the matter, and that he did not use such language as "take to the woods." He stated that he did tell them, if they would not or could not do the work, to get off the boat. Spottswood's denial that he used such language as is attributed to him is satisfactory to the

court, and disposes of that issue between the parties, even if it was at all material to the merits of this case, which it is not, in my judgment. The material facts of the case are in substance without conflict. Spottswood testified that he hired the libelants in a bunch, and not singly. They were down at the wharf, and he wanted some men. One of his men already in his employ told him these men wanted to work, and wanted to go on the boat up the river. The libelants said nothing to him, and signed no paper. He said nothing to them, but "just took their names and put them on the book." He had no express contract with them, as to the work they had to do, the period or term of employment, or about their compensation. He said that was all understood, although nothing was said about it by him or them at the time of employment.

Spottswood was undoubtedly correct when he said it was all understood, as it appears from the evidence that these men, some of them, at least, had heretofore been on a like trip or trips, in the same employment and work, and at the same compensation, as admitted by both sides in this case. It also appeared that the libelants, on the trip in question, did similar work as on the prior trips they had made. It is reasonable to suppose that those of them who had not been on the prior trips had learned from their coworkers what the work to be done was, and what the compensation to be paid was. Indeed, there was no conflict in the evidence as to the work that was done by the libelants, and the rate of compensation per day therefor, whether they worked 15, 10, or 5 days. When the libelants were called on by Mr. Spottswood to unload cross-ties from the barge alongside of the steamer onto the steamer, they refused to do so, saying they could not "tote" the cross-ties from the barge onto the steamer. They testified that they said they were too tired; that they had worked all the preceding day, Saturday, and up to 1 or 2 o'clock in the night, and could not "tote" the cross-ties as directed. Spottswood stated that they had worked three or four hours the night before, but in his opinion not later than 10 o'clock. He further testified that, when he ordered libelants to go to work removing the cross-ties from the barge to the steamer, he did not hear them say they were "tired out," or too tired to "tote" the cross-ties; that they did not say so to him, or that, if they said anything of the kind, he did not so understand it. He further testified that he told them, "If you are not going to work, get off!" He also stated that the men had worked 15 days preceding this trouble.

[1] A hiring at so much a day, week, or month, no time being specified, is an indefinite hiring, and no presumption attaches that it was for a day even, but only at a fixed rate for whatever time the party may serve. Unless the understanding of the parties was mutual that the service was to extend for a certain fixed and definite period, it is an indefinite hiring, and is determinable at the will of either party; and a recovery may be had for the services actually rendered. Wood, Master and Servant, 272. In Russell et al. v. The Twilight (D. C.) 43 Fed. 320, it was held that:

"The master of the boat was justified in discharging deck hands on an Ohio river towboat, but that the deck hands had not incurred a forfeiture of their wages for past services rendered on the trip."

"A seaman is entitled to recover wages for the time served, although discharged because of fault on his part." The Sentinel (D. C.) 152 Fed. 564; The Bell of the Coast (D.,C.) 56 Fed. 251.

[2] Aside from the rules of law announced in the authorities cited supra, the evidence as to the material facts of this case are, in my opinion, so free from conflict that the court cannot have any trouble in determining what they are. The counsel for the respondent contends that the libelants were "seamen," and should be treated as having the rights and duties incident to that relation. The libelants were employed as deck hands on the steamer, which was in the capacity and occupation of a towboat. They were designated as deck hands. The steamer was engaged in towing barges up the river empty, loading them up there with cross-ties, staves, etc., and returning with them to Mobile. The libelants were employed under an ordinary contract of hiring, without writing of specific terms of any kind. They performed the duties of deck hands, including the loading of the barges. In my opinion, the only sense in which these libelants could be deemed to be seamen is that, under the rule, a person who is employed or engaged to serve in any capacity on board a vessel is deemed to be a seaman. They certainly were not seamen in contemplation of the maritime law of Great Britain, or of the statutes of the United States providing for the contracts between vessels and their seamen, and prescribing the rights and duties incident to that relation, and which are very full, specific, and clear.

My opinion, further, is that the custom testified to by Captain Quill has no application to the case in hand. The conditions and terms of the contract made in view of the custom constituted said custom a part of the contract, and controlled the rights of the parties. No other custom was proven in this case. Moreover, Spottswood himself stated that he was not familiar with the method that obtained with the river packets in their contracts with their deck hands. A misfortune, called by Spottswood a "mishap," had overtaken him. He doubtless considered it an emergency. The libelants were there. He requested or ordered them to go aboard the barge, and to transfer the cross-ties 'from the barge to the steamer as directed. They insisted that they could not "tote" the cross-ties from the barge onto the steamer. After some further talk on the subject, the men still failing to comply with the order to go to work on the barge transferring the cross-ties, Spottswood told them, if they could not or would not do the work, to get off the boat. Shortly thereafter the men left the boat and never returned.

The learned counsel for respondent contends that they then became deserters, and thereby forfeited all wages earned for work done for the 15 days prior. He cites the case of The Galina (D. C.) 6 Fed. 927. There can hardly be any doubt that desertion entails a forfeiture of wages. But there may be a wide difference of opinion as to what facts make out a case of desertion. In my opinion the case of The Galina is not applicable to the facts in the case at bar. The meager facts set out in the head note of that case are so unlike the material facts in this case.

The case of Disbrow et al. v. The Walsh Bros. (D. C.) 36 Fed. 607, cited by counsel for respondent, was one where the libelants were hired for service on a barge, including loading and unloading, in transporting brick from Hackensack to New York at the rate of $35 per month. The barge was towed by a tug. On one of the trips the barge was discharging bricks at New York, when the libelants quit work on account of some dissatisfaction with the master. The men were not discharged by the master, and the judge stated that he could not find that they left with his assent. The court held that:

"They were legally required to remain and finish the unloading. The chief part of their work was loading and unloading the cargo. To quit work as they did was to subject the barge to liability of special expenses, or loss of two days' time."

The libelants had broken their contract before they had fully performed their part of it, and the respondent claimed a deduction of a small amount from their wages as his probable actual loss by their breach of the contract.

The Walsh Bros. Case and the case at bar differentiate in two important particulars.

First. The libelants in this case left the boat with the assent of the master, implied by his order or direction to get off the boat. It is true that the order was made in the alternative. The respondent gave the men a choice to do one or the other of two things which he required and directed them to do. The substance and effect of what he said to them was, "Go to work removing the cross-ties from the barge onto the boat, or get off the boat." Can it be seriously contended that the submission of this option to the men was not an implied assent that they might do either as they chose. They of course acted voluntarily in making their choice.

Secondly. The libelants in the Walsh Bros. Case had breached their contract expressly made in the hiring, including loading and unloading the brick. At the place of unloading, and while unloading at New York, the men quit work. While in the case before the court the contract of hiring requiring the men to load the barges at the place of loading up the river, would require them to unload them at the place of delivery, Mobile, but does not provide for unloading them at an intermediate place, onto the steamer having them in tow; nor can the contract by implication be extended to include a legal duty or requirement to do so when the necessity or supposed necessity therefor arose from a cause wholly unexpected, and not contemplated at the time the contract was made, and in the nature of things not implied in it. I do not consider that the libelants broke any contract they were under, or violated any legal duty required of them expressly or impliedly by their contract of hiring. They were directed to do work arising from a "mishap," or occurrence wholly unexpected, and not contemplated at the time the contract of hiring was made.

Whatever may be thought of an altruistic or moral obligation the men were under to help their employer, if they could, in the conditions then existing, and in his disappointment and supposed trouble under them, the court has no authority to punish the failure to per-

form such obligation, even if the judge was satisfied that they had an appreciation or recognition of such an obligation. The court would not be justified in punishing these men by a forfeiture of wages earned for services rendered prior and up to the day on which they left the boat.

From my view of the facts in this case and the law applicable thereto, my judgment is that the libelants are entitled to recover the amounts sued for respectively.

Let a decree be entered accordingly.