## GONZALES v. UNITED STATES SHIPPING BOARD, EMERGENCY FLEET CORPORATION.

(District Court, E. D. New York, at Brooklyn. November 14, 1924.)

Seamen ⊕⊃ 2—Persons employed on "laid-up fleet" held workmen and not "seamen;" "vessel."

A "laid-up fleet" of government ships not fit for service without several months of preparation, the facts and reasonable inferences therefrom showing withdrawal from navigation, *held* not "vessel," within Rev. St. § 4612, as amended (Comp. St. § 8392), defining a "seaman" as one working on a vessel, and a "vessel" as "every description of vessel navigating on any sea, or channel, lake or river"; and those employed thereon were not "seamen," but workmen, not entitled to maintain an action at law for injuries received in working in the dead ships as seamen, under Merchant Marine Act 1920, § 33 (Comp. St. Ann. Supp. 1923, § 8337a).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series; Seaman; Vessel.]

At Law. Action by Prudentio Gonzales against the United States Shipping Board, Emergency Fleet Corporation. Opinion on request for charge to jury.

Frederick R. Graves, of New York City, for plaintiff.

Ralph C. Greene, U. S. Atty., of Brooklyn, N. Y. (Nathan A. Smyth and Joseph M. Dreyer, both of New York City, of counsel), for defendant.

INCH, District Judge. About a year ago I recall that I held that a man was a seaman where the circumstances showed that the ship on which he was employed was liable any moment to be broken out and to be used in navigation. No appeal was taken from this decision for the reason, I am informed, that the verdict was for the defendant, a fact that I have no recollection of. I am unable, therefore, to find whether such

decision was a correct view of the law or not.

A few days ago a somewhat similar case came before me, and I followed without further examination my previous decision.

However, it now appears that a number of cases are coming before me, necessitating in my opinion a re-examination of this important question, with the additional fact that this so-called "laid-up fleet" is still apparently out of commission and withdrawn from navigation, and is fast becoming really a huge amount of expensive marine junk, peacefully facing its end in the sheltered waters of the Hudson river.

This particular fleet is about 130 ships, and is divided into sections, with a mother ship and about 25 on an average dead ships clustered around her, and on the ships of each section there is no steam or other evidence of possible navigation, except the steam which is piped over from the mother ship, from one boiler, for purposes apparently other than navigation, to wit, heat and light, and even on the mother ship the machinery, engines, boilers, and so forth are not in condition for present navigation without a considerable amount of delay and extra work in assembling the same, and then only after the necessary inspection. One witness says several months' work would be necessary.

Not only this, but it also appears in these cases that the work in which the alleged accident occurs usually is not on the mother ship where the crew lives. In this case it is on the Plow City, one of the dead ships, and the claim is frequently made that not only was the employer negligent, but that a particular dead ship so used was unseaworthy.

Seaworthiness implies use in navigation, and there are no facts here which indicate that these boats are anything but dead ships, and are not reasonably capable of any navigation. Not only this, but we have in fact in these cases, aside from mere names, a gang of workmen living on board and spending their time working on these dead ships, and in fact the mother ship is just as dead, so far as actual navigation goes, as the others. In a sense, if a bridge was built from one of the ships to the nearby land, it would simply be an island composed of wood and rusted iron on which these men work, so far as any real navigation goes. No articles are signed, the pay is often different from that of regular seamen, the hours are different, and I fail to see how any maritime lien could exist. The men can leave employment when desired.

But against this is the view I formerly took, as follows: Compiled Statutes, § 8392 defines "a seaman" as any "person who shall be employed or engaged to serve in any capacity on board" of any vessel.

These men live on board a boat and work on other boats. The statutes also say that this relationship shall commence when either work on board starts or articles are signed, whichever is first, indicating that it is not necessarily the articles that make the relationship. The mere fact that the boat is at anchor is not controlling. In addition, they are members of a so-called crew; they are carried on the pay roll as "seamen"; the head of this "crew" is called a boatswain; the mother ship keeps a log; the work they do is similar in most respects to that which they do at sea.

All of these separate facts appeared to me, on a somewhat hasty examination compared with the one I have made to-day, to indicate that they were "seamen," and in addition the controversy arises largely over the right of such workman to claim the advantages of the so-called "Jones Act" (Comp. St. Ann. Supp. 1923, § 8337a), which gives rights enjoyed by landsmen, to wit, railroad employees, to seamen, and therefore the claim of defendant that these various plaintiffs were simply landsmen, and should not enjoy such privileges, seemed to me to make an unnecessary distinction on that ground.

It now appears that the government is attempting to provide a fair remedy in cases of accident in the shape of compensation, which is open to all workmen, is uniform, and seems to me likely to be far more beneficial to a workman than the vagaries and uncertainties of suits, with various verdicts and various amounts actually received by plaintiffs.

Therefore, I have more carefully re-examined the contention, and believe that it is error to hold that such plaintiffs are "seamen" for the reason that while the above-mentioned facts are quite persuasive, yet they do not go far enough.

The same section of the statutes above referred to, section 8392 of the Compiled Statutes, that defines a "seaman" defines the term "vessel." As we have seen, a "seaman" is one employed on a "vessel." And this section says: A "'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river." The Standard Dictionary defines a "seaman" as: "One not an officer who takes part in the practical navigation of a

vessel—a sailor." It defines a "sailor" as "one whose occupation is to aid in navigating vessels, especially one of the crew."

While the statute has, as is seen, broadened the definition of what is "aiding in navigation" and defined it as "service in any capacity on board," and while the work of these various plaintiffs would seem to come within these definitions, there is lacking any proof that the boat or boats are "vessels"; that is, that they are in navigation.

It seems to me, therefore, that the real test is different than the one heretofore applied by me, and which I failed to apply. It is the test of "navigation," and lacking this important element these employees are not seamen, but are workmen employed by the government, and entitled to any and all rights of compensation covered by the said Compensation Act (Comp. St. §§ 8932a to 8932mm), and, in the absence of fraud or mutual mistake, are bound by mutual settlement knowingly entered into, and, further, that the boats of the "laid-up fleet," on the facts before me, are not "vessels" within the definition of the Revised Statutes, but are property of the United States, capable of being used as vessels to be sure; but until navigation takes place they are not within said definition.

What does "navigation" mean, and when is a vessel navigated? It has been said a ship is navigating when she is able to proceed under her own power. Western Union Co. v. Inman & I. S. S. Co., 59 F. 365, 8 C. C. A. 152. In some cases the vessel may be customarily moved by outside power. Saylor v. Taylor, 77 F. 476, 23 C. C. A. 343. It also includes a period when the ship is not in motion, as for instance when she is at anchor. Hayn v. Culliford, 3 C. P. D. 410, page 417. Or being repaired. Adams v. U. S. (D. C.) 281 F. 895. It might not include moving a vessel from one place to another in an unfinished state for the sole purpose of completing such vessel, but it would include any moving of a vessel which was for the purpose of profit. The Joshua Leviness, 13 Fed. Cas. p. 1155. No. 7549. The words are of relative meaning, to be determined by surrounding facts and circumstances. G. R. Booth, 171 U. S. 450, 19 S. Ct. 9, 43 L. Ed. 234; The Miletus, 17 Fed. Cas. p. 288. No. 9545.

It might often be a question of fact for the jury where a disputed series of facts appeared. Here, however, I find no disputed facts as to the "laid-up fleet." It therefore becomes a question for the court.

The Merchant Marine Act of 1920, 41 Stat. 1007, known as the Jones Shipping Act, contains section 33, which is section 20 of the Act of March 4, 1915, amended (Comp. St. Ann. Supp. 1923, § 8337a). It is under this amendment that plaintiff, and those similarly situated, claim the exceptional rights asserted. Section 37 (section 8146¼sss) under the title "words and terms in act defined" is the following: "When used in this act, unless the context otherwise requires, the terms * * * vessel * * * shall have the meaning assigned * * * by sections 1 and 2 of the Shipping Act, 1916, as amended by this Act."

Referring to this Shipping Act of 1916 as amended in 1918 (Comp. St. Ann. Supp. 1919, § 8146a), we find under section 1 the following: "The term 'vessel' includes all water craft and other artificial contrivances of whatever description and at whatever stage of construction, whether on the stocks or launched, which are used or are capable of being or are intended to be used as a means of transportation on water."

Long before this, section 3 of the Revised Statutes (Comp. St. § 3) defined a "vessel" in about the same terms. Accordingly, the definition of "vessel" in the act known as the "Jones Act," and under which this plaintiff is proceeding, is the above, taken from the Shipping Act.

It is apparent if this was all, the question would be even more doubtful, in view of this definition of "vessel." It might, however, be urged then that on the facts in this case, and in similar cases of this "laid-up fleet," it would appear that these "dead ships" are in fact not being used nor capable of being, nor intended to be used as a means of transportation. They apparently are simply useless hulks eventually to be sold as junk. One witness testified, as I have stated, several months would be needed to put them in shape.

However, the context of the Jones Act and the Shipping Act would seem to relate solely to ships, and there is no attempt to define in any of these acts "a seaman." Unless, therefore, directly or by implication the definition in the Revised Statutes, § 4612, as amended Act of December 21, 1898, chapter 28, § 23, Compiled Statutes, § 8392 (merchant seamen), was repealed, we there have a definition of "a seaman" as one who is employed or engaged to serve in any capacity on board a "vessel," and a "vessel" is defined to be every description of vessel "navigating on any sea or channel, lake or river."

Therefore, so far as defining a "seaman" is concerned, a vessel may be actually employed in navigation, although temporarily

at anchor, or in dock, but not one which is entirely out of commission and laid up for any considerable period of time, and which could not be reasonably said to be employed in navigation, one which, in other words, is plainly withdrawn from navigation.

I am not unmindful of the various decisions which extend the definition of being engaged in navigation to all sorts of crafts, some having no motive power of their own, such as dredges, but even as to these there is a conflict as to the right of a maritime lien for wages, although they seem to be in accord as to the definition of a seaman. For instance, in Saylor v. Taylor, 77 F. 476, 23 C. C. A. 343, a steam dredge, without motive power, actually engaged in deepening navigable waters, and capable of being towed from place to place, was defined as a "vessel," under the meaning of the Revised Statutes, § 3, which is as follows: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water."

The similarity here has already been commented on, and it defines persons employed on her, in such work, as "seamen" within the meaning of Revised Statutes, § 4612, above quoted. An examination of that case shows that the court held that the dredge was actually engaged in a work incidental to navigation. And while the court refers to the said Revised Statutes, § 3, for the definition of a "vessel," it also refers to the said Revised Statutes, § 4612, for the definition of a "seaman," indicating that it is the latter section that defines a "seaman."

Four years later we have the case of Breakwater Co. v. U. S., 183 F. 112, 105 C. C. A. 404, where practically the same situation as to a barge occurred, and the court held that this barge was actually engaged in a maritime duty.

Five years later, in 1915, we have the case of the J. P. Schuh (D. C.) 223 F. 455, where libelants were hired as "deck hands" on a steamer employed as a towboat, and the court on the issue before it stated: "In my opinion, the only sense in which these libelants could be deemed to be seamen is that, under the rule, a person who is employed or engaged to serve in any capacity on board a vessel is deemed to be a seaman." The supposition of that decision, however, was to hold that they were not seamen; but, aside from the real issue there decided, the facts in that case show plainly that the steamer in question was actually engaged in navigation.

It seems to me, therefore, that the true test of whether or not an employee is a "seaman" depends on whether or not he comes under the definition of this section 4612, Revised Statutes of the United States, Compiled Statutes, § 8392, which makes it necessary that the "vessel" be then engaged in navigation.

That this collection of dead ships, some partially dismantled, all of them in no shape to be used for months, and with the assertion of defendants, fairly based on facts and the reasonable inferences therefrom that they are not used or intended to be used for navigation, makes them simply property of the United States, because it is plainly indicated that these ships are withdrawn from navigation, and that these gangs of workmen on such ships, living on the mother ship, traveling from ship to ship over the bridges, are simply employees and not seamen.

As has been said in this case, it seems that this so-called "laid-up fleet" consists of about 130 ships, all tied together; 125 of them absolutely dead, without steam, while 5 have steam up in one boiler. These 5 are called mother ships, and the whole fleet is divided into five sections of an average of 25 ships clustered about this mother ship, which has this little steam for general purposes only. The gang, or so-called "crew," live on this mother ship, which is heated, and work anywhere they are told to on the other 25 dead ships. Where the statute defines and creates a relationship, parties cannot by assertions or names create such relationship unless they comply with the statute.

Assuming that plaintiff's services tendered to the preservation of these dead ships, the comment on a similar state of facts in the case of The Sirius (D. C.) 65 F. 226, at page 229, is not out of place. The court said: "Merely keeping a vessel in safe custody, protecting it from the depredations of thieves or the danger of fire, or preserving her machinery from unnecessary decay and deterioration, does not, of itself, constitute a maritime service."

In re Hoof v. Pacific Fisheries (D. C.) 284 F. 174, cited by plaintiff, it was a suit in admiralty. The vessel was afloat in navigable waters, but was not in commission. The plaintiff was a watchman. The court held that the status of the libelant, whether a seaman or not, was not material on the facts in the case and seems to have decided the case on the question of whether the defendant was neglectful in furnishing a safe

place, and in failure to warn, and also passed on the question of who was a fellow servant. The court said: "While the court has jurisdiction, the rule of right applicable, unless the plaintiff bears the relation of a seaman, is the common law right of recovery."

It would appear, however, that this decision was reversed (see Hoof v. Fisheries Co. [C. C. A.] 279 F. 367, also cited by the plaintiff), where it is held that the services of a watchman in charge of a vessel lying at the wharf were not maritime, and do not give a right to a maritime lien.

In addition to these two cases above cited by plaintiff, a third case, of Adams v. U. S. (D. C.) 281 F. 895, is cited. This also was a suit in admiralty, and the facts there show that the accident occurred but two days previous to the actual service of the ship in the Navy Department, and that she was simply resting until formally turned back to the Shipping Board, with her crew still on board, and still in charge, and that as soon as this transfer had been made, and certain necessary repairs, she was put into service as a freighter on the Munson Line.

These and other facts set forth in that opinion clearly indicate such a doubtful state of facts as not to be useful in this case of the "laid-up fleet." Accordingly, in the absence of any specific authority on this "fleet" brought to my attention, I have to fall back on the ordinary definition of "seaman" in the Standard Dictionary above mentioned, and the legal definition of the Revised Statutes, § 4612, which latter seems to be still controlling in the decisions I have read. I do not believe, therefore, that the plaintiff was here a "seaman," but that he was a workman, and shall charge the jury accordingly.

I do not grant the motion to dismiss. I will charge the jury he was a workman and not a seaman.