GRAND STREET RY. CO. (MOWRY v.). See Case No. 9,893.

GRAND TRUNK RY. CO. (CUMMINGS v.). See Case No. 3,475.

GRAND TRUNK RY. CO. (HARVEY v.). See Cases Nos. 6,180, 6,181.

GRAND TRUNK RY. CO. (SAYLES v.). See Case No. 12,419.

GRAND TRUNK RY. CO. (WALKER v.). See Case No. 17,070.

GRAND TRUNK RY. CO. (WHITEHOUSE v.). See Case No. 17,565.

---

## Case No. 5,683.

### The GRAND TURK.

[1 Paine, 73.] [1]

Circuit Court, S. D. New York. April Term, 1817.

MARITIME LIEN—WAGES OF MASTER—DISBURSEMENTS.

1. The master of a ship has no lien on the vessel, for his wages or perquisites, which can be enforced in a court of admiralty.

[Cited in Drinkwater v. The Spartan, Case No. 4,085; The Santa Anna, Id. 12,325; The

---

Larch, Id. 8,085; The Eolian. Id. 4,504; Bartlette v. The Viola, Id. 1,083; The Imogene M. Terry, 19 Fed. 463; The M. Vandercook, 24 Fed. 475.]

2. And this difference between the remedies of the master and of the mariners for wages, has not arisen from any application of the common law doctrine of liens to the case of the master, nor from encroachments of the common law courts, but because the master contracts upon the credit of the owners and not of the ship; and such a lien would be attended with great inconvenience if the master could enforce it abroad for wages due him, and thus compel a sacrifice of the ship.

[Cited in Drinkwater v. The Spartan, Case No. 4,085.]

3. Whether a master can proceed in personam in admiralty for his wages?   Quere.

[Cited in The Stephen Allen. Case No. 13,-361; The Merchant, Id. 9,434.]

4. Whether disbursements made by the master for the ship would create a lien enforcible in admiralty?   Quere.

[Appeal from the district court of the United States for the Southern district of New York.]

John Carlton the respondent filed his libel against the ship Grand Turk, alleging that in December, 1815, he was employed by William and James Dunlap, the appellants, who were her owners, to go a voyage in her as master, from New York to Belfast and back. That in the course of the voyage he had expended various sums of money for repairs, ordinary charges, and the wages of the crew; and had received various sums on account. That he claimed a right to apply whatever money he had received, in payment of his own wages and perquisites, before any of it should be applied to extinguish the disbursements made by him on the voyage; and that the appellants were insolvent. By the account annexed to the libel, it appeared that the respondent had received money enough to pay him for all disbursements he had made, and that the balance due him was not so large as his claim for wages and perquisites. The appellants put in a claim admitting most of the facts stated in the libel, but denying the respondent's right to appropriate the monies, received by him, to pay his wages, &c. because he had received them expressly on account of the ship's disbursements, and had so accounted for them with the appellants; and insisting that they should be first applied to extinguish the charges for disbursements. The claimants also insisted that the respondent had no lien on the vessel for his balance of account, the master's wages and perquisites being a mere personal charge against the owners; and on this ground excepted to the jurisdiction of the court.

The court below decreed a condemnation. [Case unreported.]

W. Slosson, for appellants.

R. Sedgwick, for respondent.

LIVINGSTON, Circuit Justice. This is a libel by the master against the ship Grand Turk, for disbursements made by him while abroad, for wages paid by him to some of the mariners after her return home, and also for wages due to himself. The district court condemned the vessel, pursuant to the prayer of the libel, and ordered all these demands to be paid out of the proceeds. From this sentence an appeal has been taken to this court. It is denied by the appellant, and of that opinion is the court, that any thing was due to the master for disbursements at the time of filing his libel. He had received from the consignee in Belfast, enough to reimburse him for all these advances, and as the money was paid for the express purpose of such reimbursement, and so credited by the master at the time, as appears by his own account and receipt, he cannot now be permitted to say that it was a payment on account of his own wages, and thus revive a credit against the owners for these advances: on this point the evidence is conclusive. Nor is it less so that the sums paid by the libellant to two of the mariners, who sued him, and which constitutes another item of his demand, were also repaid by the owners previous to the commencement of this suit. The court is, therefore, relieved from the necessity of examining whether a vessel can in any case be libelled by the master for disbursements made by him while abroad; or for wages which he may have advanced the seamen. The naked question presented for its consideration, is whether a vessel can be proceeded against in the admiralty, for wages due to the master himself. It is not denied that in England this cannot be done; and that such has generally been regarded as the law of this country—but it is supposed. that it has been thus settled by some mistake, in testing a master's right to proceed against his vessel, by the rules which apply to him at common law, of which a party is deprived, as soon as he parts with the possession of the property—or by a series of improper encroachments by courts of common law, under a statute of Richard the Second, on the jurisdiction of the courts of admiralty. If this were really the origin of the rule, and the court were satisfied that it had proceeded from an incorrect course of reasoning, as applied to the case of liens, or from an unwarrantable issuing of prohibitions by common law courts, would it not be better for the legislature to apply a remedy to the evil, if it be one, than that a single judge should expunge from the commercial code of the United States, a principle which has been sanctioned by the practice of ages in Great Britain, and which has been regarded as the law of this country from its earliest settlement down to the present day?   But it is not true that the courts of common law have proceeded on the sole ground, that because there was no possession in the master, there could be no lien—or seamen would not have been allowed to libel, which they rarely do until they have left the vessel. Nor could this reasoning have always applied to the master, who, to avoid

this technical difficulty, might have filed his libel while in actual possession of the vessel. The denial to a master of a remedy, which is every day resorted to by the sailors, must then be founded in some other reasons, and accordingly we find others assigned. One, is the inconvenience and expense to which owners would be subject, if on every dispute with the master, he could take their vessel out of their hands by process in the admiralty, and the power which would then be conferred on him of compelling them to submit to improper charges. The lien which he has on the freight which he is to receive, is given as another reason why he should be debarred of a remedy against the vessel herself; and as he is also supposed to contract personally with the owners, so it has been thought proper not to permit him to look elsewhere for satisfaction. Thus we see, that it is not merely because the contract of the master is made on land, or because some mistake has been made in applying to him the strict doctrine of liens as understood at common law, that he is not allowed to proceed against his own vessel, but for other reasons, which by many will probably be considered as founded in good sense, and fully to justify the conclusions which have been drawn from them. Sir William Scott, in the case of The Favourite, 2 C. Rob. Adm. 232, considers the inability of a master to sue in the admiralty as arising altogether from his being supposed to stand on the security of his personal contract with his owner, and not relating to the bottom of the ship; and in the case of Wilkins v. Carmichael,[2] Lord Mansfield refused to allow the master to retain the vessel, either for wages, stores, or repairs. This was a case in which the master had not parted with the possession, and where his owner had become a bankrupt, whose assignees were plaintiffs in an action of trover. The whole court of king's bench was of opinion, that there was no particular contract that the ship should be a pledge; that there was no usage of trade to that purpose, nor any implication from the nature of the dealing: that on the contrary, the law had always considered the master as contracting personally with the owner.—On this ground, it is added, prohibitions have been granted. Thus we see that this has been treated in England, not merely as a question of jurisdiction, but that it has long been considered by all the tribunals of that country, as a settled principle of law, that a right of proceeding in rem for a claim of this kind never did exist in the master. It has not been shown that such a proceeding was ever sustained by any English court of admiralty, even before the act of Richard the Second. But were it not so perfectly and well settled as it is, that the master never had this security for his wages, and the court was at liberty to adopt a rule of its own, it would

hesitate much before it gave to him the remedy which is now sought. If he may thus proceed for wages after the return to the port where the owner resides, he must have the like privilege for wages which may become due in foreign ports, by which an opportunity would be afforded him of breaking up the voyage while abroad, for the purpose, sometimes, of becoming purchaser of the vessel, under a sentence founded on proceedings originating with himself, and where a condemnation might be had before the owner could possibly be apprized of the suit. Were this a proceeding in the admiralty in personam, it might then be worth while to consider whether, notwithstanding the prohibitions which have been awarded in England, and the consequent abandonment or loss of jurisdiction in many cases by the admiralty, this court would not maintain an action of that kind. If it decided in favour of its admiralty jurisdiction in such a case, it would be introducing no new rule of law, but enforcing one already established, and in a way which, although it may not, for a long time, have been resorted to, could work no injury to either party: but where a right to proceed in rem has been so long and so pertinaciously denied, and on grounds which, to say the least of them, are sufficiently plausible, and when it cannot be shown, with any certainty, ever to have existed, this court feels no inclination to interfere for the purpose of introducing a different rule. It is possible that the English common law courts have first granted prohibitions, on the ground that these being contracts upon land, the admiralty had no right, after the passing of the statute of 15 R. 2, c. 3, to take cognizance of them; but although this may have been deemed a sufficient ground for their interfering in this way, yet we find these courts invariably deciding, when it becomes necessary, that the master has no right by his contract to any remedy against the vessel, or even any lien on its proceeds, and so the whole court of king's bench certified their opinion to be to the lord chancellor in the case of Hussey against Chester and others. The judgment of the court is, that the sentence of the district court be reversed, and that the libel be dismissed with costs.