## WESTERN UNION TEL. CO. v. INMAN & I. STEAMSHIP CO.

## INMAN & I. STEAMSHIP CO. v. WESTERN UNION TEL. CO.

(Circuit Court of Appeals, Second Circuit. January 12, 1894.)

Nos. 32, 33.

NAVIGABLE WATERS—OBSTRUCTION BY SUBMARINE CABLE.

    A vessel which, though touching bottom, forces her way by her own screw through the soft mud, is "navigating;" and if, while so doing, her screw is fouled by, and breaks, a submarine cable, the burden is on the cable company to show that the cable was so constructed and maintained as "not to obstruct navigation," as required by Rev. St. § 5263; and this burden is not sustained when there is nothing to show the actual condition of the cable at the time, and it appears that it was originally laid near the end of an existing pier used by large ocean steamers, and over a mud bank, which they must necessarily plow through at certain states of the tide. 43 Fed. 85, affirmed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

In Admiralty. These were cross libels to recover damages caused by the breaking of a submarine cable by the screw of the steamship City of Richmond, and for fouling of the screw thereby. In the district court the libel of the telegraph company was dismissed, and that of the steamship company sustained. 43 Fed. 85. This decree was affirmed pro forma by the circuit court, and the telegraph company appeals. Affirmed.

Statement by LACOMBE, Circuit Judge:

    These are appeals by the Western Union Telegraph Company from pro forma decrees of the circuit court affirming decrees of the district court, southern district of New York. Cross libels were brought by the parties, each claiming its damages sustained on August 16, 1887, by a fouling of the screw of the S. S. City of Richmond with submarine cables owned by the telegraph company, and extending under the North river from at or near Courtland street, on the New York side, to and under the Netherland Steamship Company's pier, on the Jersey City side. The Netherland pier was there, and in use by ocean steamers, before the cables in question were laid under it; and ocean steamers have been in the habit of docking at Jersey City for 40 years. The cables of the libelant were first laid there in 1867, under authority of the act of congress of July 24, 1866. The district judge found the telegraph company solely in fault, dismissed its libel, and sustained the cross libel of the steamship company.

David D. Duncan, for appellant.

Henry G. Ward, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge, (after stating the facts.) Briefly stated, the movements of the steamship on the day in question were as follows: She arrived in the vicinity of the Inman pier at about 9 A. M., on a flood tide. That pier is immediately below the Netherland pier, and immediately above the Red Star pier. Her own berth, on the north side of the Inman pier, was occupied by another steamer of that line, and the slip south of that pier was full of barges. The flood tide made it necessary for her to proceed some distance above, and then round to, so as to make the end of her pier (the only place available for landing passengers) against the tide,—a maneuver equally necessary when she makes the slip on a flood tide. She lay, while discharging her cabin passengers and baggage over a forward gang plank, at the southern end of her pier, with her stern angling out in the river, and projecting up stream. By the time these were landed, the tide had fallen so much that she was in part touching the bottom, and, had she remained there till fully aground, the unevenness of the bottom would have caused damage by straining. She could not move forward without running into the Red Star pier, nor could she proceed directly astern, as she lay, without risk of hitting a broad barge which lay at the end of the Netherland pier. With the aid of two powerful tugs hauling with hawsers on her port quarter, her stern was breasted out till the hawsers broke; the stern then resting in the mud at the bottom of the river some little distance southeast of the Netherland pier. Her propeller was then put in motion; the tugs still hauling at right angles to her course, so as to keep her stern down to southward until she struck the ebb tide. Steadily, and without any apparent obstruction or stoppage of her motion, the steamer, under her reversed screw, moved onward through the mud, passing on her way through a mud bank about 300 feet off the Netherland pier, until she reached the middle of the river, where she anchored. None of her officers, who were at their respective posts, and attentive to their duties, were conscious of her touching, striking, or fouling anything. The second officer, who was stationed at the stern, noticed a water-logged pile in motion near the sternpost, which he surmised had been started up from the bottom by the action of the propeller. Reporting this circumstance, the next day, to the first officer, a diver was sent down, and found fragments of seven or eight submarine cables entangled in the screw.

The act of congress above referred to gives libelant the right to lay its cables "under the navigable streams of waters in the United States," with the limitation or condition that such lines "shall be so constructed and maintained as not to obstruct the navigation of such streams and waters."

The district judge has elaborately set forth the facts in evidence, and, in affirming his decision, we do not deem it necessary to re-

state them all.   The appellant has criticised some of his statements as to the character of the bottom at the locality in question, on the ground that they are not in all respects sustained by proof; but it is abundantly established by uncontradicted evidence that the cables intersected the line of a bank of mud which lay off the Netherland pier, and that the mud composing that bank was of such a character that the City of Richmond, under a reversed screw, navigated herself through it stern first by her own power.   That a vessel is navigating when she is able to thus proceed by the use of her own power is a self-evident proposition, which needs no citation to support it, though reference may be made to Gould, Waters, § 87; Mayor, etc., of Colchester v. Brooke, 7 Q. B. 339; Ferguson v. Steamship Co., 10 Vict. Law R. 279.

It being clear that the steamer was navigating, it is for the owner of the cables to show that they were not so maintained as to obstruct navigation.   Here, in the nature of things, the evidence is unsatisfactory.   No one knows the condition of affairs at the bottom of the river on the morning in question.   Whether, by reason of some kink, a part of one of the cables was protruded upward into the water, or whether one of them rested on the water-logged pile in such manner that when the latter was disturbed by the screw it momentarily raised the cable above its ordinary location, or at what depth in the soft navigable mud the cables rested that morning, is all a matter of conjecture.   Aside from occasional fouling of the cables by anchors, there is no evidence to show that they had theretofore interfered in any way with the movement of vessels, except that, a short time before, the propeller of the steamer Westernland had come in contact with them.   When it is considered that the locality in question had been occupied for years by ocean steamers as large as the City of Richmond, which necessarily must, upon occasions, have plowed their way through this mud bank, the fact that the cables were never thus caught before is suggestive that there had been some recent change in their position.   But, whatever the cause of the accident in question, the owner of the cables laid across this navigable stream has failed to show that it did not happen because of any failure to maintain them in such a way as not to obstruct navigation; and, as the owners of the steamship have shown that she was navigating when she encountered them, the person who undertook to maintain the cables so as not to obstruct navigation has failed to sustain the burden of proof which the accident cast upon him.

Counsel for the appellant has argued at great length, and with abundant citation of authority, upon the question, what is the proper construction to be given to the words of limitation in the act, "not to obstruct the navigation?"   The conclusion for which he contends is thus stated in his brief:

"The test must be, does it unreasonably, unnecessarily obstruct, in view of the objects to be accomplished?   Does it obstruct or interfere with the navigation more than is necessary?   Some interference, under some possible conditions and circumstances, is necessary; but is it reduced to the minimum in a given case?"

In answer to this, two suggestions will suffice. Each case should be disposed of upon its own facts; and it may be taken as a safe rule that the degree of obstruction will vary with the character and extent of the navigation. In the case now before the court, the locality for the crossing was selected, for all that appears, voluntarily by the libelant. There is nothing to show that it was constrained by any necessity to lay its cables where it did, and not elsewhere. The obligation to maintain the cable so as not to obstruct navigation is fully operative when the question of a place to lay it is being decided. This locality had been occupied for years before by ocean steamers. The Jersey end of the cable was carried ashore under a dock built for and used by such steamers. The telegraph company knew, or could easily have ascertained, that, in certain conditions of the tide, there was not water enough off that pier for vessels such as these to navigate without plowing through the surrounding mud and silt, and is chargeable with knowledge that while such vessels, proceeding on their course up or down a river, will ordinarily keep well off from the shoaler water, it is to be expected that, where their own piers are located, they will navigate up, down, across, and in every conceivable course, however tortuous, while making their way through natural difficulties and obstructions to their landing places. Counsel refers to the City of Richmond as "operating in some peculiar mode, or under some special, extraordinary conditions;" but just such mode, and just such conditions of operation, were to be expected at the place selected for the cable. It is not unreasonable, therefore, to hold the owner of the cable to a greater measure of precaution in maintaining it when laid there than when laid in some other place where such peculiar conditions of navigation do not exist.

It is urged that the City of Richmond is nevertheless liable because the general agents of the Inman Line and the dock superintendent had knowledge that there were Western Union cables running from under the Netherland pier. Neither the pilot, however, nor the ship's navigating officers, knew of the presence of the cables; and there is no evidence of that malicious disregard of another's right of property which was held controlling in Mayor, etc., of Colchester v. Brooke, 7 Q. B. 339, and Cobb v. Bennett, 75 Pa. St. 326. In the absence of any notice by sign put up at the cable crossing, which the evidence shows is usual, we do not feel warranted in holding the City of Richmond responsible for navigating over the cable; and, even if her officers knew it was there, they might fairly assume it was so maintained as not to obstruct her navigation.

The decrees of the district court are affirmed, with interest and costs.