## THE HERDIS.  THE G. A. KOHLER.
## THE B. S. TAYLOR.

District Court, D. Maryland.  November 2,
1927.

Nos. 1459, 1461.

1. Seamen ⬥27(9)—Whether one is entitled
   to preferred maritime lien for wages of crew
   is determined from nature of services per-
   formed (Ship Mortgage Act, § 30, subsec. M
   [46 USCA § 953]).

Whether one is entitled to preferred mari-
time lien under Ship Mortgage Act, § 30, subsec.
M (46 USCA § 953 [Comp. St. § 8146¼nnn]),
for wages of crew of vessel, must be determined
from nature of services performed.

2. Seamen ⬥27(9)—Former masters, acting
   as caretakers of vessels moored in navigable
   waters, performing maritime services, were
   entitled to preferred maritime liens for wages
   under Ship Mortgage Act; "seaman;" "crew"
   (Ship Mortgage Act, § 30, subsec. M [46
   USCA § 953]).

Former masters, acting as caretakers of
vessels moored in navigable section of Balti-
more harbor, performing maritime services of
keeping steam up for pumps and winches, keep-
ing vessels pumped out, attending to proper
anchorage, etc., were entitled to preferred mar-
itime liens for wages as part of crew of vessel,
under Ship Mortgage Act, § 30, subsec. M (46
USCA § 953 [Comp. St. § 8146¼nnn]), and
were entitled to priority over mortgagees in
fund in registry from sale; "crew" being group
of seamen belonging to vessel, and "seaman"
being one who takes part in practical naviga-
tion of vessel, and fact that ship's officers are
denied wage liens, being immaterial.

[Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Crew;
Seaman.]

3. Seamen ⬥27(9)—Any ambiguity in statute
   relating to preferred maritime liens must be
   resolved in favor of seaman (Ship Mortgage
   Act, § 30, subsec. M [46 USCA § 953]).

Any ambiguity in Ship Mortgage Act, § 30,
subsec. M (46 USCA § 953 [Comp. St. §
8146¼nnn]), relating to preferred maritime
liens for wages of crew of vessel, must be re-
solved in favor of seamen, since it is a historic
maxim of admiralty courts that seamen shall be
accorded special consideration and protection.

In Admiralty.  Libels by the Continental
Trust Company against the schooner Herdis,
and against the schooner G. A. Kohler and
the schooner B. S. Taylor, for foreclosure of
mortgages, in which one Hopkins and one
Hansen and others intervened.  Decree for
interveners named for amounts claimed as
liens.

Edward Duffy, of Baltimore, Md., for
libelant.

John Henry Skeen and Marbury, Gosnell
& Williams, all of Baltimore, Md., for
claimants.

COLEMAN, District Judge.  These two
cases raise the same questions and were heard
together.  The libel of the Continental Trust
Company in the case against the schooner
Herdis alleges that a mortgage for $40,000
upon the vessel was executed to the libelant
by the owners, the Maryland Navigation
Company, on April 9, 1924; that it con-
formed to the requirements of the Ship Mort-
gage Act of 1920 (46 USCA §§ 911–984
[Comp. St. §§ 8146¼jjj–8146¼t]), and
therefore constitutes a "preferred mortgage,"
as defined by that act.  The same facts are
alleged as to the schooners G. A. Kohler and
B. S. Taylor, except that the mortgage cover-
ing both of these vessels was for $42,000, and
was executed May 18, 1924.  The libels then
set out the bankruptcy of the owners, and
ask for foreclosure of the mortgages, sale of
the vessels, and payment out of the proceeds,
etc.  A number of intervening libels on ac-
count of supplies furnished subsequent to the
date of the mortgages were filed.  In addi-
tion, there was filed against the Herdis a
libel by her former master for $446.92, being
the portion of agreed wages, at the rate of
$160 per month, still unpaid, for services as
caretaker from the time the schooner was
laid up in Baltimore on April 1, 1926, till it
was seized by the marshal on September 2,
1926.  A similar libel was filed against the
schooner G. A. Kohler, claiming $212.67 for
like services by her former master, at the rate
of $175 per month.

The vessels were sold under the original
libels on November 19, 1926, and there was
paid into the registry $4,835.98 on account of
the Herdis, and $12,428.13 on account of the
other two schooners.  The mortgages, being
admittedly valid, are prior to the subsequent
supply liens under the express provisions of
section 30, subsection M, of the Ship Mort-
gage Act (41 Stat. 1004 [46 USCA § 953;
Comp. St. § 8146¼nnn]).  In fact, this is
conceded by counsel for the supply men.
The only material question, then, is whether
the wage claimants are entitled to priority
over the mortgagees in the fund in the regis-
try.  If they are not, obviously nothing re-
mains with which to pay them.  The basis of
the wage claimants' contention is that their
claims are for "wages of the crew of the
vessel," giving them a "preferred maritime
lien," within the language of section 30, sub-
section M, which reads as follows:

"(a) When used hereinafter in this sec-
tion, the term 'preferred maritime lien' means
(1) a lien arising prior in time to the record-
ing and indorsement of a preferred mortgage

in accordance with the provisions of this section; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, *for wages of the crew of the vessel*, for general average, and' for salvage, including contract salvage.

"(b) Upon the sale of any mortgaged vessel by order of a District Court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all pre-existing claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of subsection L shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over *all* claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court."

The precise question here raised seems never to have been decided, at least in the reported cases, namely: Are caretakers on vessels, temporarily idle, but still afloat and moored in navigable waters, within the meaning of the term "crew," as used in the Ship Mortgage Act? Here the idleness was due to decline in shipping, resulting in inability on the part of the owners to obtain cargoes, terminating in their insolvency.

The facts of this case show that all three vessels were moored in a navigable section of Baltimore harbor, and the duties of the caretakers were such as only a competent seaman could perform; that is, they had to keep steam up for the pumps and winches, keep the vessels pumped out, attend to proper anchorage, especially in stormy weather, so as to prevent the vessels from drifting into positions hazardous to themselves and to other craft. They had not been dismantled. [1] The nature of the services performed in every case must be closely examined. Thus, where the services are such as only a seaman could perform, they have been held maritime, as, for example, moving of a vessel with the rise and fall of the tide, Wishart v. The Jos. Nixon (D. C.) 43 F. 926; attending to proper anchorage, pumping, and drying sails, The Hattie Thomas (D. C.) 59 F. 297; The Maggie P. (D. C.) 32 F. 300. But, if the services are such as not to require the efforts of a mariner, the result is otherwise. For example, services of watchmen on vessel laid up at her wharf, or launched, but still under

22 F.(2d)—20

construction, or laid up for repairs, or for the winter. Hoof v. Pacific Am. Fisheries (C. C. A.) 279 F. 367; Pacific Am. Fisheries v. Hoof (C. C. A.) 291 F. 306; The Fortuna (D. C.) 206 F. 573; The James T. Furber (D. C.) 157 F. 127.

Clearly the services in the present instance fall within the former classification, and are therefore maritime. The interpretation here adopted is further strengthened by the fact that these vessels were, during the period in controversy, subject to the pilot rules governing signals and lights on vessels at anchor, and by the further fact that, after their sale, they were refitted, are now again engaged in commerce, and have never been withdrawn from navigation, so far as the evidence discloses. But we have still to determine whether such watchmen are part of the "crew," as that word is used in the act, because conceivably persons other than members of a "crew" may perform service of a maritime nature on a vessel.

"Crew" is defined in the Standard Dictionary as "a group of seamen belonging to a vessel." "Seaman" is there defined as "one who takes part in the practical navigation of a vessel." Webster's International Dictionary defines "crew" as "a company of seamen who man a ship, vessel, or boat; the whole company belonging to a vessel or a boat." The same dictionary defines "seaman" as "one whose occupation is to assist in the management of ships at sea; a mariner; a sailor; applied to officers and especially to common sailors." In the well-considered case of Gonzales v. U. S. Shipping Board (D. C.) 3 F.(2d) 168, it was held that workmen employed upon vessels definitely withdrawn from navigation, relegated to a ships' graveyard, were not "seamen" within the meaning of the Merchant Marine Act (of which the Ship Mortgage Act is a part), because not engaged in navigation. There the court said (pages 170 and 171):

"What does 'navigation' mean, and when is a vessel navigated? It has been said a ship is navigating when she is able to proceed under her own power. Western Union Co. v. Inman & I. S. S. Co., 59 F. 365, 8 C. C. A. 152. In some cases the vessel may be customarily moved by outside power. Saylor v. Taylor, 77 F. 476, 23 C. C. A. 343. It also includes a period when the ship is not in motion, as, for instance, when she is at anchor, Hayn v. Culliford, 3 C. P. D. 410, 417; or being repaired, Adams v. U. S. (D. C.) 281 F. 895. It might not include moving a vessel from one place to another in an un-

finished state, for the sole purpose of completing such vessel; but it would include any moving of a vessel which was for the purpose of profit. The Joshua Leviness, 13 Fed. Cas. 1155, No. 7,549. The words are of relative meaning, to be determined by surrounding facts and circumstances. G. R. Booth, 171 U. S. 450, 19 S. Ct. 9, 43 L. Ed. 234; The Miletus, 17 Fed. Cas. 288, No. 9,545. * * * Unless * * * directly or by implication the definition in Revised Statutes, § 4612, as amended [by] Act of December 21, 1898, c. 28, § 23, Compiled Statutes, § 8392 (46 USCA § 713), as to merchant seamen, was repealed, we there have a definition of 'a seaman' as one who is employed or engaged to serve, in any capacity on board a 'vessel,' and a 'vessel' is defined to be every description of vessel 'navigating on any sea or channel, lake or river.' Therefore, so far as defining a 'seaman' is concerned, a vessel may be actually employed in navigation, although temporarily at anchor, or in dock, but not one which is entirely out of commission and laid up for any considerable period of time, and which could not be reasonably said to be employed in navigation, one which, in other words, is plainly withdrawn from navigation."

The vessels in the present case are clearly distinguishable, because never withdrawn from navigation, having been only *temporarily* idle. In International Stevedoring Co. v. Haverty, 272 U. S. 50, 47 S. Ct. 19, 71 L. Ed. 157, the Supreme Court has quite recently decided that the term "seamen" in the Merchant Marine Act includes stevedores engaged in the work of stowing cargo. While the analogy is not perfect, it is nevertheless very persuasive. Justice Holmes, in rendering the opinion of the court, said (page 52 [47 S. Ct. 19]):

"It is true that for most purposes, as the word is commonly used, stevedores are not 'seamen.' But words are flexible. The work upon which the plaintiff was engaged was a maritime service formerly rendered by the ship's crew. Atlantic Transport Co. v. Imbrovek, 234 U. S. 52, 62 [34 S. Ct. 733, 58 L. Ed. 1208, 51 L. R. A. (N. S.) 1157]. We cannot believe that Congress willingly would have allowed the protection to men engaged upon the same maritime duties to vary with the accident of their being employed by a stevedore rather than by the ship. The policy of the statute is directed to the safety of the men and to treating compensation for injuries to them as properly part of the cost of the business. If they should be protected in the one case, they should be in the other. In view of the broad field in which Congress has disapproved and changed the rule introduced into the common law within less than a century, we are of opinion that a wider scope should be given to the words of the act, and that in this statute 'seamen' is to be taken to include stevedores employed in maritime work on navigable waters as the plaintiff was, whatever it might mean in laws of a different kind."

[2, 3] In conclusion, it seems clear that the watchmen in the present instance must be considered as embraced within the term "crew," because that term is the composite definition of seamen performing maritime services on a vessel in navigation. True, there was only one man for each vessel; but that is not material. Each one alone performed the same duties that might have been performed by a number of individuals. One was found to be sufficient for each vessel under the circumstances. Whatever language seemingly contrary to this construction may be found in such earlier cases as The Hoquiam (C. C. A.) 253 F. 627, and Cassil v. U. S. Emergency Fleet Corporation (C. C. A.) 289 F. 774, must be considered as overruled by the Haverty Case. The fact that these men formerly served on the same vessels in the capacity of master does not affect their present rights, Wishart v. The Joseph Nixon, supra; or the fact that ship's officers are denied wage liens, Grand Turk, 10 Fed. Cas. 956, No. 5,683. It is an historic axiom of admiralty courts that seamen shall be accorded special consideration and protection. So any ambiguity in the words of the statute affecting their rights should, if reasonable to do so, be resolved in their favor.

For the foregoing reasons, a decree will be entered for the libelants, Hopkins, and Hansen for the amounts claimed.