In re GOOD SHIP APPLEDORE,
LTD., Debtor.

William H. HOWISON,
Trustee/Plaintiff,

v.

KEY BANK OF SOUTHERN MAINE,
et al., Defendants.

Bankruptcy No. 88–10113.
Adv. No. 88–1087.

United States Bankruptcy Court,
D. Maine.

Dec. 20, 1990.

Harlan J. Choate, Augusta, Me., for Small Business Admin.

Dennis C. Hagemann, Damariscotta, Me., for Robert and Jean Adler.

William H. Howison, Anthony, Howison & Landis, Portland, Me., Trustee.

## MEMORANDUM OF DECISION

JAMES B. HAINES, Jr., Bankruptcy Judge.

This matter comes before the court on trustee's complaint to determine liens. The parties have filed factual stipulations, stipulations of admissibility of exhibits, and trial briefs. The case has been submitted on the stipulated record.

### Background

Good Ship Appledore, Ltd., filed its Chapter 7 petition in bankruptcy on March 21, 1988. William H. Howison was appointed trustee. At the date of filing, the debtor's only asset was the schooner "Appledore" which had been left unattended at Ashley Marina in Charleston, South Carolina. On or about September 7, 1988, Trustee Howison filed his complaint seeking to sell the schooner free and clear of liens and requesting a determination of the validity, extent and priority of liens on the vessel. Thereafter, with this court's authorization, the trustee sold the "Appledore" and paid all costs and expenses of sale. He now holds net sale proceeds in the amount of $57,992.80, pending a determination of the extent and priority of liens.

Determination of the extent, priority and validity of liens requires that the court consider the claims of the United States of

America on behalf of the Small Business Administration (SBA) and those of Robert and Jean Adler.[1] The SBA claims it is entitled to $13,160.55 advanced by Key Bank of Southern Maine ("Key Bank") for care and preservation of the "Appledore" as a priority administrative expense under Bankruptcy Code § 506(c). It further claims it is the holder of a first preferred ship's mortgage in the amount of $179,226.03.[2] Robert Adler asserts a preferred maritime lien in the amount of $6,000.00 for funds advanced to the "Appledore" to pay crew wages. Robert and Jean Adler claim preferred maritime liens in the amount of $1,350.00 for their own crew wages. Robert and Jean Adler also claim a third preferred ship's mortgage on the "Appledore", securing a debt of $57,822.00.

### 1. *The SBA Loan and Mortgage.*

On November 10, 1986, Steven R. Adler and Brenda K. Adler, as president and vice-president, respectively, of the debtor submitted to Key Bank an application for a loan in the amount of $175,000.00 to purchase the "Appledore". Key Bank, in turn, approached the SBA for an 85% guaranty of the proposed loan. On November 19, 1986, SBA issued its authorization for the loan and guaranty. As part of the package, the SBA required standby agreements

of W.H. Nichols, Robert Adler, and Steven Adler.[3] On November 25, 1986, Robert S. Adler executed and delivered to Key Bank his debt subordination agreement in the amount of $45,000.00 as required by the SBA authorization.[4]

Key Bank loaned $175,000.00 to Good Ship Appledore, Ltd., backed by the SBA guaranty. The loan is evidenced by a promissory note and was secured by a first preferred ship's mortgage on the vessel "Appledore" dated November 25, 1986 in favor of Key Bank. The mortgage was recorded with the U.S. Coast Guard on July 20, 1987 at 10:45 a.m. in Book PM–57, Page 400. Key Bank assigned the note and mortgage to the SBA on January 8, 1988 and recorded the assignment with the U.S. Coast Guard on February 16, 1988 at 9:45 a.m. in Book PM–61, Instrument No. 412.

### 2. *The Adler Note and Mortgage.*

The debtor, by its president, Steven R. Adler, executed a promissory note dated December 22, 1987, in the amount of $52,000.00 payable to Robert S. Adler and Jean E. Adler. The note was secured by a third preferred ship's mortgage dated December 30, 1987, recorded with the Coast Guard Registry in Boston on February 16, 1988, in Book PM–61, Page 413.[5]

---

1. A priority maritime lien filed by the trustee of chapter 7 debtors Stephen and Brenda Adler was dismissed by stipulation dated June 12, 1990. As discussed below, Stephen Adler was a principal of Good Ship Appledore, Ltd. His case is separately administered.

2. The figure in the text is the amount set forth in the SBA's proof of claim, filed March 24, 1988. Key Bank loaned $175,000.00, guaranteed by SBA to the extent of 85%, to "Good Ship Appledore, Ltd.", as evidenced by a promissory note dated November 25, 1986. The promissory note was secured by a mortgage on the vessel "Appledore", also dated November 25, 1986, in favor of Key Bank of Southern Maine. On January 8, 1988, both the promissory note and the preferred ship's mortgage were assigned by Key Bank to SBA. *See* discussion *infra.*

3. The stand-by agreements were in the form of debt subordination agreements by which Nichols and the Adlers agreed to subordinate all present and future indebtedness of the borrower to them to the present and future indebtedness of the borrower to Key Bank.

4. The purchase price of the schooner "Appledore" was $250,000.00. Key Bank agreed to loan $175,000.00 to the Debtor and SBA provided its 85% guaranty. The $75,000.00 balance required for the purchase was represented to the loan officer as being comprised of: $10,000.00 cash investment by principal, Stephen Adler, and $65,000.00 by two investors, one of which was Robert Adler. Robert, Stephen's father, furnished $45,000.00 toward the purchase price of the schooner "Appledore". The originally intended character of the $45,000.00 advance, whether as investment, a loan to Stephen, a loan to the debtor, or something else, is unclear.

5. The SBA contends that the debt evidenced by the note includes, *inter alia,* Robert Adler's initial $45,000.00 advance. As discussed below, in light of the findings and conclusions reached today, it is unnecessary to determine whether that is the case.

### 3. *Second Party Wage Claims.*

Robert Adler claims a priority maritime lien for a loan made to the "Appledore" for payment of crew wages totalling $6,000.00, documented by notice of claim of lien recorded with the U.S. Coast Guard Registry in Boston on March 2, 1988 in Book L1, No. 824. The funds were advanced in the form of two· checks written on Robert Adler's personal checking account.[6]

### 4. *First Party Wage Claims.*

Robert and Jean Adler claim priority maritime liens for their own crew wages in the amount of $1,350.00 for work performed on board the "Appledore" on various dates and at various locations. Robert Adler performed services which included refitting the vessel and a variety of other tasks, including painting, sanding, cleaning, making mechanical repairs, rebuilding a top mast, carpentry, electrical work, and deck work. Jean Adler cleaned, painted, sanded, rendered laundry and bedding services, and labored on deck. The value of the services performed by Robert and Jean Adler was $150.00 a week for a period of 9 weeks, a total of $1,350.02.[7]

Robert Adler confirmed his claim for personal crew wages by filing a notice with the United States Coast Guard in Boston, recorded on March 2, 1988, in Book L1, No. 824. Jean Adler did likewise, filing a notice with the United States Coast Guard in Boston, recorded on March 2, 1988, in Book L1, No. 826.

### 5. *Administrative Advances.*

At the time of the bankruptcy, the debtor had abandoned the schooner at Ashley Marina in Charleston, South Carolina. Directly and through Key Bank, the SBA has advanced to or on behalf of the trustee the sum of $13,160.55 for care and preservation of the "Appledore". The SBA claims that it is entitled to be repaid this amount as a priority claim because it is "subrogated" to the claim of the trustee, who would be entitled to that amount as a priority administrative expense under Bankruptcy Code § 506(c).[8]

On May 19, 1988, this court entered an order approving trustee's application for allowance of administrative expenses, authorizing him to pay Captain Havilah Hawkins $3,786.00 for services to be rendered on board the schooner. The order also authorized a $400.00 payment to Cheney Insurance Agency for insurance coverage on the boat during the voyage. On June 24, 1988, the bankruptcy court entered another order authorizing the trustee to pay Captain Hawkins $5,415.20.[9] Thus, out of the SBA's $13,160.55 administrative claim, $9,601.20 has already been authorized by the court.[10]

---

**6.** The checks were drawn on Robert Adler's account at Key Bank of Southern Maine, Account #42326794. On September 24, 1987, Robert Adler wrote a check payable to "Good Ship Appledore" in the amount of $5,500.00. On October 9, 1987, Robert wrote a check payable to "Cash" in the amount of $500.00 drawn on the same account.

**7.** SBA has stipulated that the work was performed and that $1,350.00 is its reasonable value. Initially, in affidavits filed in support of their claims, the Adlers averred that they worked on board the Appledore for one week in March, 1987 in Red Hook Harbor, St. Thomas, Virgin Islands. In addition Mr. Adler claimed he worked on the schooner for two weeks in December, 1986 also in Red Hook Harbor, four weeks in September, 1987 at the Gamage Boat Yard in South Bristol, Maine and 1 week in May 1987 in port at Gamage Boat yard and docked at Chebeague Island, Maine. The stipulation has reduced the amount of the claim substantially and has eliminated disputes about the value of the services.

**8.** The Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, will hereafter be referred to by section number only.

**9.** Amounts paid to Captain Hawkins represented the payment for his for services and expenses to transport the vessel Appledore from Charleston, South Carolina to Camden, Maine.

**10.** In each instance, the trustee discussed the need to pay expenses for the vessel with Key Bank and the SBA and obtained their agreement to advance the necessary funds. In Key Bank's first request to the SBA for reimbursement for the SBA's 85% share of the expenses, dated May 1988, Kathryn Underwood, assistant vice-president, wrote to Mr. Ivey, "As you are aware, Key Bank of Southern Maine has been requested to pay a number of bills up front for maintenance of the Appledore." (Government's exhibit 19).

Of the remaining $3,559.35 claimed by the SBA, $1,180.00 represents a March 1988 payment for dockage fees it paid directly to Ashley Marina, Charleston, South Carolina. The SBA was directly invoiced by Ashley Marina. On April 27 and May 16, 1988, Key Bank made payments of $1,054.35 and $975.00, respectively, for April dockage and repairs and for May dockage. The latter two bills were invoiced to the trustee. In addition, on August 31, 1988, Key Bank paid $100.00 to Steven Otton as reimbursement for wages paid to Captain Hawkins for moving the "Appledore" from Camden to Rockport Harbor. On that date, it also paid $250.00 to Daniel B. Merin as payment for mooring rental in Rockport Harbor. These expenditures have not been previously authorized.

### Discussion

1. *SBA's Claim for $13,160.55 Advanced for Care and Preservation of the "Appledore".*

 a. Bankruptcy Code § 506(c).

 ■ The SBA seeks $13,160.55 of the funds held by the trustee as reimbursement for the advances made by it and on its behalf by Key Bank for the care and preservation of the schooner. As indicated above, the expenditure of $9,601.20 has already been authorized. SBA asserts that its claim for reimbursement is entitled to priority because it is subrogated to the trustee's claim for that amount as a priority administrative expense under Bankruptcy Code § 506(c).[11] Although it is true that § 506(c) ostensibly authorizes only the trustee to recover, other parties have been permitted to recover from sale proceeds the reasonable, necessary costs and expenses of preserving, or disposing of, encumbered property. In *In re World Wines, Ltd.*, 77 B.R. 653 (Bankr.N.D.Ill.1987) the court held that lessor who maintained a creditor's collateral during administration of the debtor's bankruptcy had standing to sue to recover cost of preserving it. In *In re T.P. Long Chemical, Inc.*, 45 B.R. 278 (Bankr. N.D.Ohio 1985) the court permitted the Environmental Protection Agency to bring a § 506(c) claim because it found that the EPA had assumed the trustee's duty to remove hazardous waste.

In his applications for allowance of administrative expenses the trustee represented that the expenses incurred in moving the schooner from South Carolina to Maine were necessary to preserve and to help dispose of the "Appledore" because increasing water and air temperatures in the southern climate would begin to damage the vessel. The court orders authorizing the expenses found them to be necessary, actual expenses of preserving and disposing of the estate's sole asset. Since the costs already have been authorized and appear in all respects to have been reasonable, the SBA is entitled to recover $9,601.20 as a priority administrative expense under § 506(c). The remaining $3,559.35 is recoverable, albeit not under the same provision, under 46 U.S.C.App. § 953(b)(2).

 b. Treatment Under 46 U.S.C.App. § 953(b)(2).

 ■ Although no party challenges the SBA's claim for the balance of its expenses, it is the court's proper office to pass upon requests seeking allowance of expenses of administration.[12] Federal statute fixes the priority of liens in the foreclosure of a preferred ship's mortgage.[13]

---

Clearly, the bank and the SBA provided the funds to preserve and maintain the "Appledore." By virtue of the assignment discussed above at note 2, SBA is seeking reimbursement for advances made by Key Bank, as well as by itself. Its right to so proceed is unchallenged.

**11.** 11 U.S.C. § 506(c): "The Trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim."

**12.** Bankruptcy Code § 503 provides that an entity may file a request for payment of an administrative expense, and that after notice and a hearing, there shall be allowed administrative expenses including the actual, necessary costs and expenses of preserving the estate.

**13.** 46 U.S.C.App. § 953(b) reads "Upon the sale of any mortgaged vessel by order of a district

The "expenses and fees allowed and costs taxed by, by the court," insofar as they arise out of foreclosure proceedings and administering the custody of the vessel, are paid in priority to preferred mortgage liens.[14] The $3,559.35 that was not previously approved as an administrative expense is recoverable under the statute.

The SBA and Key Bank paid $1,180.00; $1,054.35 and $975.00 to Ashley Marine for dockage fees and repairs in March, April and May 1988. They also paid $100.00 to Steve Otton on account of post-petition wages and $250.00 to Dan Merin for mooring rental in August 1988.

In *New York Dock Co. v. The Poznan,* 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927) the Supreme Court held that a district court, sitting in admiralty, has the equitable power to give priority to claims arising from the administration of property within the court's jurisdiction. This rule is plainly consistent with 46 U.S.C.App. § 953(b)(2). *Payne v. SS Tropic Breeze,* 423 F.2d 236 (1st Cir.1970), *cert. denied* 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970).

In *Kingstate Oil v. M/V Green Star,* 815 F.2d 918, 923 (3rd Cir.1987) the Third Circuit, reviewing a decision denying an application for priority reimbursement of the costs of a ship's post-arrest unloading, stated that if expenditures inure to the benefit of all claimants, they can be legitimately allowed as an administrative expenses under § 953(b). *See also General Electric Credit & Leasing Corp. v. Drill Ship Mission Exploration,* 668 F.2d 811, 816 (5th Cir.1982) (services or property advanced to preserve and maintain vessel under seizin, furnished upon authority of the court or an officer of the court acting within his authority, should be allowed as *custodia legis* expenses).

Upon the filing of the petition, the bankruptcy estate was created.[15] Thus, the schooner was in custody of this court at all relevant times. The record indicates that except for the initial $1,180 in dockage fees paid directly by the SBA, the other expenses were paid on the authority of the trustee who apparently had a standing agreement with SBA that it would advance payments to cover the costs of maintaining the "Appledore."

That a court order authorizing each of these payments was not obtained by the trustee in advance is not fatal to SBA's claim of priority under § 953(b)(2).

> While it is preferable to secure a court order authorizing this expense before incurring it, nevertheless ... these *"custodia legis* expenses" may be ordered by the court to be paid in priority [to the other secured claims] if 'equity and good conscience' so require.

*General Electric Credit & Leasing, supra,* 668 F.2d at 815. Though no prior court authority was obtained, the payments for dockage fees and for transferring the "Appledore" to Rockport Harbor, were for services which did inure to the benefit of all claimants. They are proper § 953(b) expenses and, therefore, are awarded to the SBA on a first priority basis.[16]

14. *Id.*

15. Bankruptcy Code § 541(a).

court of the United States in any suit in rem in admiralty for the enforcement of a preferred mortgage lien thereon, all preexisting claims in the vessel, including any possessory common-law lien of which a lienor is deprived under the provisions of section 952 of this title, shall be held terminated and shall thereafter attach, in like amount and in accordance with their respective priorities, to the proceeds of the sale; except that the preferred mortgage lien shall have priority over all claims against the vessel, except (1) preferred maritime liens, and (2) expenses and fees allowed and costs taxed, by the court.

16. The court also notes that, in any event, the SBA would be entitled to recovery of these expenses under the terms of its first preferred ship's mortgage, discussed *infra,* which provides:

> The net proceeds of any judicial or other sale, and any charter, management, operation or other use of the vessel by Mortgagee, of any claim for damages, of any judgment, and any insurance received by Mortgagee (except to the extent paid to Owner or applied in payment of repairs or otherwise for Owner's benefit) shall be applied as follows:
> FIRST: To the payment of all attorney's fees, court costs, and *any other expenses, losses, charges, damages incurred or advances made* by Mortgagee in the protection of its rights or caused by Owner's default hereunder

### 2. *The Adlers' Wage Claims.*

Robert and Jean Adler claim a preferred maritime lien in the amount of $1,350.00 for services performed on board the "Appledore". Title 46, U.S.C.App. § 953(a) defines a preferred maritime lien, and 46 U.S. C.App. § 953(b) affords it priority over a preferred ship's mortgage.[17] The parties have stipulated to the nature and value of the services performed by the Adlers.[18] The Adlers argue that, as "wages of the crew of the vessel", their claims should be paid ahead of the SBA's preferred ship's mortgage.[19] The SBA contends that, whatever they may have done, the Adlers did not serve as the schooner's crew so as to qualify their claim for maritime lien status.

▮ The underlying rationale for the maritime lien, including the lien for wages, is to promote extensions of credit to the maritime industry by providing a security device that lessens the risks to a person who extends credit in an industry where assets are mobile, transient, and not easily determinable. Consistent with this rationale, preference should be given to those creditors who are in the poorest position to determine the solvency of the debtor. *Pierside Terminal Operators, Inc. v. M/V Floridian*, 374 F.Supp. 27 (E.D.Va.1974), *rev'd on other grounds* 529 F.2d 221 (4th Cir.1975). The priority of seamen's wage claims to mortgage liens reflects this policy. *See Payne v. S.S. Tropic Breeze, supra*, 423 F.2d at 242.[20]

In order for the Adlers to be entitled to sustain their claims to $1,350.00 as preferred maritime liens, they must be for "wages of the crew of the vessel" within the meaning of § 953(a). The Adlers were not listed on the schedule of "Appledore's" crew members.[21] However, the word "crew" does not have a fixed legal significance. Normally, "crew" connotes the company of persons, including the officers, belonging to one vessel and engaged in her navigation. *Young Patrol Service v. S.S. Eldorado*, 310 F.Supp. 1326, 1327 (N.D.Cal. 1970).

In *The Herdis*, 22 F.2d 304 (D.C.Md.1927) the court held that caretakers on vessels, temporarily idle, but moored in navigable

---

or under the note secured hereby, with default interest at the highest legal rate per annum; and to provide adequate indemnity against any liens for which priority over this Mortgage is claimed;
SECOND: To the payment of all interest, to day of payment, on the note and any or all other sums secured hereby, and as to any balance of such proceeds, to the payment next of any or all matured instalments of principal and then of any or all unmatured instalments of principal in the inverse order of their maturity.
Mortgagee shall be entitled to collect any deficiency from Owner. Owner shall be entitled to any surplus, subject to set-off in favor of Mortgagee for any other indebtedness of Owner.
(Emphasis added).
Of course, the priority of payment under the first mortgage would be junior to the *custodia legis* expenses. *Payne v. S.S. Tropic Breeze, supra*. However, in light of the disposition remaining priority issues, that is of no consequence in this case.

**17.** 46 U.S.C.App. § 953(a) reads "When used hereinafter in this chapter, the term "preferred maritime lien" means (1) a lien arising prior in time to the recording and indorsement of a preferred mortgage in accordance with the provisions of this chapter; or (2) a lien for damages arising out of tort, for wages of a stevedore when employed directly by the owner, operator, master, ship's husband, or agent of the vessel, for *wages of the crew* of the vessel, for general average, and for salvage, including contract salvage." (Emphasis supplied.)

**18.** *See* n. 7, *supra*.

**19.** For text of § 953(b) see footnote 13, *supra*.

**20.** Notices of liens (including preferred maritime liens for wages of the crew) against any vessel subject to a preferred mortgage may be filed with the collector of customs at the proper port. However, the filing is permissive, not mandatory: the status and rank of the lien are not defeated by a failure to file. *Chase Manhattan Financial Services, Inc. v. McMillian*, 896 F.2d 452, 456 (10th Cir.1990); *U.S. v. ZP Chandon*, 889 F.2d 233, 238 (9th Cir.1989). *See* Gilmore & Black, *The Law of Admiralty*, § 9–72 (2d ed. 1975).

**21.** It appears as if the listing of the names and addresses of the "Appledore's" captains and crew members was prepared and/or provided in response to this court's order dated August 8, 1989 directing Stephen R. Adler and Brenda K. Adler to turn over to trustee all corporate records and documents including, *inter alia,* names and addresses of all persons that were engaged as captains or crew for the vessel.

waters, came within the meaning of the term "crew", where the duties of the caretakers were such as only competent seamen could perform.

> The nature of the services performed in every case must be closely examined. Thus, where the services are such as only a seaman could perform, they have been held maritime, as, for example, moving of a vessel with the rise and fall of the tide, attending to proper anchorage, pumping, and drying sails. [Cites omitted.] But, if the services are such as not to require the efforts of a mariner, the result is otherwise.

*Id.* at 305.

In *Port Welcome Cruises, Inc. v. S.S. Bay Belle*, 215 F.Supp. 72, 86 (D.Md.1963), the court held that wage claims of maintenance men aboard a vessel while the vessel was "laid up" at a pier obtained a preferred maritime lien for their wages. Other modern cases demonstrate that requirements for establishing valid crew wage claims have come to be applied less rigidly than in the past. *See, e.g., International Paint Co. v. M/V Mission Viking*, 637 F.2d 382 (5th Cir.1981) (wage claims for catering and cleaning services were entitled to a preferred maritime lien for "crew wages" with priority over a preferred ship mortgage).

The services performed by Robert and Jean Adler, described in detail above, are within the range of those routinely performed by crew members. The Adlers are entitled to preferred maritime liens for their wages claims in the aggregate amount of $1,350.00.

### 3. *Funds Advanced for Wages.*

Robert Adler claims a maritime lien for repayment of advances in the total amount of $6,000.00. The claim is documented by a notice recorded with the U.S. Coast Guard Registry in Boston on March 2, 1988.

#### a. The $5,500.00 Advance.

On September 24, 1987 Robert Adler wrote a check on his account at Key Bank in the amount of $5,500.00 made payable to "Good Ship Appledore". The memo note on the face of the check reads "personal loan." The "Appledore's" checking account statements with Damariscotta Bank & Trust Co., dated September 30, and October 30, 1987 document a $5,500.00 deposit on September 24, 1987. The statements also show that the deposit was first applied to a pre-existing $413.43 overdraft and then used to fund checks as they were posted to the account.[22] All but one of the checks

---

**22.** The statements show that, after covering the overdraft, the balance of $5,086.57 was used to cover the following checks:

| Check No. | Date Posted | Payee | Amount |
|---|---|---|---|
| 234 | 9/24 | D B & T | 308.48 |
| 232 | 9/25 | Renys | 27.40 |
| 229 | 9/25 | NAT Wilson | 500.00 |
| 226 | 9/25 | ME Liferaft & Inflatable Co. | 636.74 |
| 236 | 9/28 | Louis Doe Home Center | 10.89 |
| 227 | 9/28 | Key Bank | 1000.00 |
| 237 | 9/29 | Portland Glass | 5.61 |
| 233 | 9/29 | Western Auto | 14.12 |
| 238 | 9/29 | Corning | 150.14 |
| 228 | 9/29 | Jennifer Steel | 1400.00 |
| 231 | 9/30 | Cheney Insur. Agency | 354.00 |
| 240 | 9/30 | Shop n' Save | 285.66 |
| 242 | 10/2 | Cathy & Gale | 42.30 |
| 241 | 10/2 | Gamage Shipyard | 500.00 |

After the payment of check #241, the account was overdrawn by $152.77.

funded by the deposit went to pay non-wage expenses.[23]

Check # 228, in the amount of $1,400.00 dated September 24, 1987, was payable to Jennifer Steel and bears the note "July & Aug. pay". Although there is no other evidence that such payment was for wages, Jennifer Steel is listed as a member of "Appledore's" crew. It would be reasonable to infer from these facts that she received payment for "crew wages" in that amount.

b. The $500.00 Advance.

As to Robert S. Adler's October 9, 1987 $500.00 check payable to "Cash", the "Appledore's" checking account records do not disclose a corresponding deposit. Nothing in the record indicates that these funds benefited the "Appledore", let alone that they went to pay wages of its crew.

c. Analysis.

 Those who advance money to pay crew's wages are entitled to a maritime lien of the same rank. *Medina v. Marvirazon Compania Naviera, S.A.*, 533 F.Supp. 1279, 1286 (D.Mass.1982), *Aff'd* 709 F.2d 124 (1st Cir.1983). It has been said that the statute creates the presumption that advances made for seaman's wages are made on the credit of the ship. *The Englewood*, 57 F.2d 319, 320 (E.D.N.Y.1932).

However, when the right to a maritime lien as to seaman's wages is being claimed by subrogation, the subrogee must show "the individual seaman paid and the amounts paid to each, ..." *Id.* A maritime lien cannot be sustained simply by showing an advance to the master of a specified sum for the purpose of paying seaman's wages, without showing its application for that purpose. *Id. See also Reconstruction Finance Corp. v. The William D. Mangold*, 99 F.Supp. 651, 653 (E.D.N.Y.1951) ("The law is that when a party advances money to pay the wages of the crew of a vessel ... and asserts a lien against the vessel for such advances in a concursus proceeding as against third parties, he must prove with certainty that the money so advanced went directly to pay lien claims against the boat.")

 The evidence discloses that of the $6,000.00 claimed as wage advances, only $5,500.00 can be traced to the schooner's account and only $1,400.00 may have been paid to a crew member for wages.

The record does not sustain Robert Adler's claim for a subrogated preferred maritime lien for crew wages. Even as to the $1,400.00 component of the claim, one cannot conclude that the advance was made *for the purpose* of paying crew wages.[24]

---

**23.** An examination of the checks discloses the following:

| Check No. | Date Posted | Notation on Face of Check |
| --- | --- | --- |
| 234 | 9/24 | Sept. loan |
| 232 | 9/25 | insur. |
| 229 | 9/25 | sail repair |
| 226 | 9/25 | 20 man liferaft service |
| 236 | 9/28 | stove pipe |
| 227 | 9/28 | July mortgage bal. on Appledore |
| 237 | 9/29 | chronmeter face |
| 233 | 9/29 | Ampmeter & lubriplate grease |
| 238 | 9/29 | Re: Dishes |
| 228 | 9/29 | July & Aug pay |
| 231 | 9/30 | insur. |
| 240 | 9/30 | food |
| 242 | 10/2 | Kero & gas |
| 241 | 10/2 | various services |

**24.** Given the various uses to which funds were put, the inevitable conclusion is that, if crew wages were paid from the sums advanced, it was fortuitous. Moreover, one claiming preferred lien status on account of advances for crew wages must be "a stranger" to the ship. *Medina v. Marvirazon Compania Naviera, S.A., supra*, 533 F.Supp. at 1287. Were the issue reached, it is questionable whether Robert Adler, who is clearly an "insider" to the debtor under Bankruptcy Code § 101(30)(B)(vi), would qualify as a "stranger" to the ship.

### 4. First Preferred Mortgage Claim.

 Key Bank was the holder of a valid first preferred ship's mortgage on the "Appledore" dated November 25, 1986. The mortgage was properly recorded with the U.S. Coast Guard on July 20, 1987.[25] The first preferred ship's mortgage was assigned by Key Bank of Southern Maine to SBA on January 8, 1988 and a notice of the assignment was subsequently recorded. Assignment of a ship's mortgage does not destroy its preferred character.[26] Thus, if Key Bank held a valid first preferred ship's mortgage, SBA, as assignee, holds the same. The third preferred ship's mortgage held by Robert and Jean Adler was recorded by the Coast Guard in Boston on February 16, 1988 at 10:05 a.m.

 The SBA mortgage was recorded on July 22, 1987. It obtained its preferred status at that time. The Adler mortgage was recorded February 16, 1988. The SBA mortgage outranks the mortgage to the Adlers because it was recorded first.[27] The provisions of § 953(b) entitle the preferred mortgage lien to priority over all claims against the vessel, including those secured by later recorded mortgages, except pre-existing liens, preferred maritime liens, and expenses and fees allowed and costs taxed, by the court.

The proceeds of the sale of the vessel are insufficient to discharge the claims for § 506(c) expenses, the preferred maritime claims for wages and the first preferred ship's mortgage in full. There are thus no proceeds available to satisfy inferior claims including the Adlers' third preferred ship's mortgage.[28]

### Conclusion

For the reasons set forth above, the court fixes priorities to the proceeds from the sale of the "Appledore" in the following order:

1. The SBA is entitled to reimbursement of the $9,601.20 in court-approved administrative expenses, 11 U.S.C. § 506(c), and to reimbursement for additional expenses incurred after the vessel was in *custodia legis* in the amount of $3,559.35. 46 U.S.C.App. § 953(b)(2).

2. Robert and Jean Adler are entitled to $1,350.00, collectively, in satisfaction of their preferred maritime liens for

---

**25.** 46 U.S.C.App. § 922(a) and (b) set forth the necessary requirements for a ship's mortgage to claim "preferred" status given by the provisions of § 953:

> 1. the mortgage particulars must be endorsed upon the vessel's documents;
> 2. the mortgage must be recorded with the United States Coast Guard at the port of documentation of the vessel, together with the date and time of its recordation and endorsement;
> 3. the mortgage must be accompanied by an affidavit of good faith to effect that the mortgage is made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel;
> 4. the mortgage must not stipulate that the mortgagee waives the preferred status; and
> 5. the mortgagee must be a citizen of the United States.

No party has challenged Key Bank/SBA's compliance with the statute so as to give it a valid first preferred mortgage. The mortgage was recorded by the Coast Guard and, therefore, in the absence of evidence to the contrary, its validity is established. *Westinghouse Credit Corp. v. O/S Dorothy Claire,* 732 F.Supp. 59, 61 (E.D.Tex.1989).

**26.** *Pierside Terminal Operators, Inc. v. M/V Floridian,* 374 F.Supp. 27, 30 (E.D.Va.1974) *Rev'd on other grounds,* 529 F.2d 221 (4th Cir.1975) ("The general rule relating to maritime liens is that they may be assigned and the assignee has the same priority as the assignor had absent any specific statutory prohibition, there is no apparent reason why preferred ship mortgages should not be similarly assignable, so long as the other requirements of the statute are met.")

**27.** 46 U.S.C.App. § 922(a) provides that a "valid mortgage which at the time it is made, includes the whole of any vessel of the United States ... shall ... have, in respect to such vessel and *as of the date of the compliance* with all the provisions of this subsection, the preferred status given by the provisions of § 953 of this title ..." (Emphasis supplied.) *See Westinghouse Credit Corp. v. O/S Dorothy Claire, supra,* 732 F.Supp. at 61.

**28.** These findings and conclusions, together with the limited funds available for distribution, make it unnecessary to address the question whether all or part of the Adler's $52,000.00 mortgage claim should be subordinated under the Key Bank/Robert Adler subordination agreement or on other grounds.

crew wages. 46 U.S.C.App. § 953(a), (b).

3. The SBA is entitled to the remaining available proceeds in satisfaction of its first preferred ship mortgage.

This memorandum shall constitute the court's findings of fact and conclusions of law in accordance with B.R. 7052. A separate order consistent with this opinion will be filed with the clerk forthwith.